Slip Op. 07-175

## UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————— :
                                         :
NMB SINGAPORE LTD., et al.,              :
                                         :
            Plaintiffs,                  :
                                         :
                                         :   Before:        WALLACH, Judge
        v.                               :   Consol. Court No.:  06-00182
                                         :
UNITED STATES,                           :   **PUBLIC VERSION**
                                         :
            Defendant,                   :
                                         :
        and                              :
                                         :
THE TIMKEN COMPANY,                      :
                                         :
            Defendant-Intervenor.        :
———————————————————— :

[Plaintiffs' Rule 56.2 Motions for Judgment Upon the Agency Record are DENIED; and the
Agency's Determination is AFFIRMED.]

Dated: November 30, 2007

Sidley Austin LLP, (Neil R. Ellis and Neil C. Pratt) for Plaintiffs JTEKT Corporation and Koyo
Corporation of U.S.A.

Crowell & Moring LLP, (Matthew P. Jaffe, Robert A. Lipstein and Sobia Haque) for Plaintiffs
NSK Corporation and NSK Ltd.

Michael A. Hertz, Deputy Attorney General; Jeanne E. Davidson, Director, Commercial
Litigation Branch, Civil Division, U.S. Department of Justice (Michael D. Panzera); and Arthur
D. Sidney, Office of the Chief Counsel for Import Administration, U.S. Department of
Commerce, of Counsel, for Defendant United States.

Stewart and Stewart, (Terence P. Stewart, Eric P. Salonen and Sarah V. Stewart) for Plaintiff and
Defendant-Intervenor the Timken Company.

## OPINION

**Wallach, Judge:**

## I

## INTRODUCTION

This case comes before the court on Plaintiffs' Rule 56.2 Motions for Judgment Upon the Agency Record.  Plaintiffs JTEKT Corporation and Koyo Corporation of U.S.A. (collectively "JTEKT"), NSK Corporation and NSK Ltd. (collectively "NSK"), and The Timken Company ("Timken") challenge aspects of the determination of the Department of Commerce ("Commerce" or "the Department") in <u>Ball Bearings and Parts Thereof from Japan and Singapore; Five-year Sunset Reviews of Antidumping Duty Orders; Final Results</u>, 71 Fed. Reg. 26,321 (May 4, 2006), as amended by <u>Ball Bearings and Parts Thereof from Japan; Five-year Sunset Review of Antidumping Duty Order: Amended Final Results</u>, 71 Fed. Reg. 30,378 (May 26, 2006).

This opinion concerns the Department's second five-year (sunset) review of the antidumping order covering ball bearings from Japan. <u>Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings, and Parts Thereof From Japan</u>, 54 Fed. Reg. 20,904 (May 15, 1989) ("<u>1989 AD Order</u>").  Because dumping continued above <u>de minimis</u> levels after the issuance of the order and through the period of review, and import volumes declined over the life of the order, Commerce's determination is AFFIRMED, and Plaintiffs JTEKT and NSK's Motions for Judgment Upon the Agency Record are DENIED. Because Commerce properly reported a more recently calculated dumping margin to the International Trade Commission ("ITC"), Plaintiff Timken's Motion for Summary Judgment

Upon the Agency Record is DENIED.  The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).

## II

## BACKGROUND

As a result of investigations by Commerce and the ITC into antifriction bearings (other than tapered roller bearings) and parts thereof from Japan, Commerce issued an antidumping order in May 1989. 1989 AD Order, 54 Fed. Reg. 20,904.  Since the issuance of the antidumping order, the Department has conducted annual administrative reviews of ball bearings from Japan and in 1999 conducted its first sunset review in which it found that revocation of the antidumping duty order would likely lead to continuation or recurrence of dumping at the same rates as found in the original investigation. Memorandum from Stephen J. Claeys, Deputy Assistant Sec'y for Import Admin. to Joseph A. Spetrini, Acting Assistant Sec'y for Import Admin. ("Preliminary Decision Memo") (December 28, 2005) at 2-3 (citing Final Results of Expedited Sunset Reviews: Antifriction Bearings From Japan, 64 Fed. Reg. 60,275, 60,280 (November 4, 1999) ("First Sunset Review")).

In June 2005 Commerce published a notice of initiation of the second five-year review of the order. Initiation of Five-year "Sunset" Reviews, 70 Fed. Reg. 31,423 (June 1, 2005) ("Notice of Initiation").  The domestic interested party, Timken, filed a notice of intent to participate in accordance with 19 C.F.R. § 351.218(d)(1)(i), and several "interested parties," within the meaning of 19 U.S.C. § 1677(9)(A), including NSK and JTEKT, filed timely substantive responses. See Ball Bearings and Parts Thereof From Japan and Singapore; Five-Year Sunset Reviews of Antidumping Duty Orders; Preliminary Results, 70 Fed. Reg. 76,754 (December 28,

2005) ("Preliminary Results"); see also Preliminary Decision Memo at 3-4.  As a result, the

Department commenced a full sunset review. Preliminary Results, 70 Fed. Reg. at 76,754.

On December 28, 2005 Commerce published the Issues and Decision Memorandum

accompanying its Preliminary Results of the full sunset reviews; in this memorandum,

Commerce concluded that revocation of the orders would likely lead to the continuation or

recurrence of dumping. Preliminary Decision Memo at 13.  Commerce in its analysis addressed

issues raised by the respondents in their substantive responses to the notice of initiation. Id. at 4-

5.  In response to the arguments presented by the Japanese respondents, Commerce concluded

that dumping was likely to recur because dumping margins were above de minimis levels

throughout the period of review and the value and weight of imports declined post-order and

remained below pre-order levels. Id. at 10.  Commerce specifically declined to alter its

calculation of the original margins and rejected the respondents' argument that its methodology

was invalidated by the World Trade Organization ("WTO") decisions on the practice of

"zeroing" because the use of the methodology remained valid under United States law. Id. at 9-

10; see also Preliminary Results, 70 Fed. Reg. at 76,755 (citing the Statement of Administrative

Action ("SAA") accompanying the Uruguay Round Agreements Act ("URAA"), Pub. L. No.

103-465, H. Doc. 103-316, vol. VI at 659, 1032 (1994); Corus Staal BV v. United States, 395 F.

3d 1343 (Fed. Cir. 2005)).

The Department also rejected NSK's assertion that the order should be revoked because

of a lack of domestic support for its continuation. Preliminary Decision Memo at 10.  The

Department stated that there is "no threshold that the domestic industry must meet in order to

participate in sunset reviews," so long as the domestic respondents timely filed a valid notice of

intent to participate. Id.  Because the Department determined in the first sunset review that its

calculations "were probative of behavior without the discipline of the orders," it decided to resubmit the same margins during the second review. Id. at 12; see First Sunset Review, 64 Fed. Reg. at 60,280.

In May 2006, Commerce issued its Final Results of the second sunset review, in which it affirmed, in part, its findings in the Preliminary Results and concluded that revocation of the antidumping duty order would likely lead to the continuation or recurrence of dumping.[1] Final Results, 71 Fed. Reg. 26,321; Memorandum to David M. Spooner, Assistant Sec'y for Import Admin. to Stephen J. Claeys, Deputy Assistant Sec'y for Import Admin. (May 4, 2006) ("Decision Memo") at 4-5. Commerce decided that that it was reasonable to conclude that dumping was likely to recur if the order was revoked because dumping margins had been above de minimis in the original investigation and in all fifteen subsequent administrative reviews. Decision Memo at 4-5. Commerce, furthermore, concluded that the application of its margin-calculation methodology is in accordance with the dumping statute and that respondents did not provide adequate evidence to support their claims that absent Commerce's methodology, weighted-average margins would be zero or de minimis. Id. at 5.

With respect to Commerce's duty to report to the ITC the magnitude of the margin of dumping likely to prevail if the orders are revoked, Commerce in its Final Results rejected Timken's argument that the Department should affirm its Preliminary Results and use the margins calculated for the original investigation. Id. at 7-8. Instead, Commerce agreed with the respondents that the rates calculated for JTEKT and NSK in the five most recent reviews were a

---

[1]  Although Commerce largely incorporated by reference the Preliminary Results in the Final Results, it did not include a chart detailing Apparent Consumption and Imports from Japan as a Share Thereof in the period 1987-2004 which had been included in the Preliminary Results. Preliminary Results, Attachment 2, BBs-Apparent Consumption and Imports from Japan as a Share Thereof.

more appropriate gauge of the margins likely to prevail if the order were revoked. Id. at 9.

Consequently, Commerce revised its margins in the Final Results and determined that the

margins likely to prevail were 12.78% and 8.28%[2] for JTEKT and NSK respectively, compared

to 73.55% and 42.99% in the original investigation. Id.  Commerce also affirmed its position that

it did not act contrary to law by commencing a sunset review on the basis of one domestic

party's response to its notice of initiation. Id. at 11.

On June 2, 2006 petitioners, NMB Singapore Ltd., Pelmec Industries (PTE) Ltd., and

NMB Techs. Corp. (collectively "NMB Singapore"), NTN Corporation, NTN Bearing Corp. of

Am., Am. NTN Bearing Mfg. Corp., NTN-BCA Corp. NTN Bower Corp., NTN Driveshaft, and

NTN Kugellagerfabrik GmbH (collectively "NTN"), NSK and JTEKT timely commenced

separate civil actions contesting Commerce's Final Results pursuant to 28 U.S.C. § 1581(c). See

NMB Singapore Summons, Ct. No. 06-00182 (June 2, 2006); NTN Summons, Ct. No. 06-00185

(June 2, 2006); JTEKT Summons, Ct. No. 06-00187 (June 2, 2006); NSK Summons, Ct. No. 06-

00190 (June 2, 2006).  On June 5, 2006 Timken timely commenced an action as a producer

within the meaning of 19 U.S.C. § 1677(9)(C) pursuant to 28 U.S.C. § 2631(c). Timken

Summons, Ct. No. 06-00188 (June 5, 2006).  On July 31, 2006 this court granted Timken's

motions to intervene as of right in the actions commenced by Plaintiffs JTEKT and NSK. Order,

Ct. No. 06-00187 (July 31, 2006); Order, Ct. No. 06-00190 (July 31, 2006).  On the same day the

court granted Plaintiffs JTEKT and NSK's motions to intervene as of right in the action

commenced by Timken. Order (NSK), Ct. No. 06-00188 (July 31, 2006); Order (JTEKT), Ct.

No. 06-00188 (July 31, 2006).  On August 30, 2006, the Court granted Defendant the United

---

[2] This figure was subsequently changed in the Department's Amended Final Results to 8.25%
following consideration of NSK's ministerial-error allegation. 71 Fed. Reg. at 30,378.

States' consent motion to consolidate <u>NMB Singapore Ltd., et al. v. United States</u>, Ct. No. 06-

00182, <u>NTN Corp. et al. v. United States</u>, Ct. No. 06-00185; <u>JTEKT Corp. et al. v. United States</u>,

Ct. No. 06-00187; <u>Timken Co. v. United States</u>, Ct. No. 06-00188; and <u>NSK Corp. and NSK Ltd.</u>

<u>et al. v. United States</u>, Ct. No. 06-00190 under lead case <u>NMB Singapore Ltd., et al. v. United</u>

<u>States</u>, Ct. No. 06-00182.  On November 14, 2006 and November 16, 2006 respectively, NTN

and NMB Singapore filed notices of dismissal pursuant to USCIT R. 41(a)(1)(A).  The claims

addressed in this opinion, as a consequence, pertain only to the Department's review of the order

on ball bearings from Japan.

## III

## STANDARD OF REVIEW

In reviewing antidumping duty determinations this court "shall hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." <u>Huaiyin Foreign Trade Corp. v. United States</u>, 322 F.3d 1369, 1374 (Fed. Cir.

2003) (citing <u>Consol. Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229, 83 L. Ed. 126, 59 S. Ct. 206

(1938)).  It is "something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent an administrative agency's finding

from being supported by substantial evidence." <u>Consolo v. Federal Mar. Comm'n</u>, 383 U.S. 607,

619-20, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966) (citing <u>N.L.R.B. v. Nevada Consol. Copper</u>

<u>Corp.</u>, 316 U.S. 105, 106, 62 S. Ct. 960, 86 L. Ed. 1305 (1942)).

The existence of substantial evidence is determined by "considering the record as a

whole, including evidence that supports as well as evidence that 'fairly detracts from the

substantiality of the evidence.'" Huaiyin Foreign Trade Corp., 322 F.3d at 1374 (citing Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  The substantial evidence standard requires that "all of the competent evidence must be considered, whether original or supplemental, and whether or not it supports the challenged conclusion." Heisig v. United States, 719 F.2d 1153, 1157 (Fed. Cir. 1983).

In reviewing an agency's construction of a statute the court applies the Chevron two-prong analysis, which first looks at whether Congress has spoken directly to the issue and second, where Congressional intent is unclear "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 842-43.  The agency's construction need not be the only reasonable interpretation or even the most reasonable interpretation. Zenith Radio Corp. v. United States, 437 U.S. 443, 450, 98 S. Ct. 2441, 57 L. Ed. 2d 337 (1978).  Thus, "[a]s long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." Ceramica Regiomontana v. United States, 10 CIT 399, 405, 636 F. Supp. 961 (1986) (citing Chevron U.S.A. Inc. v. Nat. Res. Def. Council, 467 U.S. 837, 843, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)).

# IV

# DISCUSSION

## A
## Commerce's Determination that Revocation of the Antidumping Order Covering Ball Bearings from Japan would Lead to the Continuation and Recurrence of Dumping was Supported by Substantial Evidence and is in Accordance with Law

### 1
### Commerce Lawfully Determined to Conduct a Sunset Review Based Upon the Participation of One Domestic Interested Party

Plaintiffs NSK argue that the antidumping order on ball bearings from Japan should be revoked for lack of domestic support. Memorandum of Points and Authorities in Support of NSK's Motion for Judgment Upon the Agency Record ("NSK's Brief") at 27, 31.  NSK challenges Commerce's decision to initiate a full sunset review on the basis of the participation of only one domestic interested party. Id. at 6-7, 27.  Plaintiffs assert that the regulations which require that Commerce only conduct a full sunset investigation if the combined responses of interested non-domestic parties account for more than 50% of total exports of the subject merchandise results in disparate treatment of foreign interested parties. Id. at 27.  NSK also contests how Commerce decides the adequacy of the substantive responses received by domestic and foreign respondents for purposes of 19 U.S.C. § 1675(c)(3)(B), and argues that Commerce has failed to create similar thresholds for domestic and foreign interested parties. Id. at 27-28; see 19 U.S.C. § 1675(c)(3)(B); 19 C.F.R. § 351.218(e)(1)(i)-(ii).

Defendant contends that it properly determined that there was sufficient participation by the domestic industry in accordance with requirements set forth in 19 C.F.R. 351.218(e)(1)(i). Defendant's Response to Plaintiffs' Motions for Judgment Upon the Agency Record ("Defendant's Response") at 10.  Commerce also argues that the statutory scheme does not

require that that it treat domestic and respondent interested parties the same in determining whether responses to a notice of initiation are adequate. Id. at 11. Consequently Commerce concludes that it did not act contrary to law when it decided to conduct a full sunset review based on the participation of only one domestic interested party. Id.

Pursuant to statute, Commerce is expected to conduct a review of an antidumping order every five years after its issuance. 19 U.S.C. § 1675(c)(1). In that connection, Commerce's mandate is to issue a notice of initiation in which it requests that that "interested parties," as defined in 19 U.S.C. § 1677(9), submit certain relevant information relating to their willingness to participate in the review and the likely effects of revocation of the order. 19 U.S.C. § 1675(c)(2). Commerce requires that at least one domestic interested party files a notice of intent to participate in the sunset review. 19 U.S.C. § 1675(c)(3)(A); 19 C.F.R. § 351.218(d)(1)(iii)(B)(7). If no domestic interested party responds, Commerce may revoke the order. 19 U.S.C. § 1675(c)(3)(A); 19 C.F.R. § 351.218(d)(1)(iii)(B)(3). If an interested party's response is deemed "inadequate" Commerce may, without further investigation, issue a final determination based on the facts available. 19 U.S.C. § 1675(c)(3)(B).

In the regulations promulgated to implement Section 1675, Commerce requires that "substantive responses" submitted by all interested parties must, inter alia, contain "[a] statement regarding the likely effects of revocation of the order . . . which must include any factual information, argument, and reason to support such statement;" and "[f]actual information, argument, and reason concerning the dumping margin . . . that is likely to prevail if the Secretary revokes the order." 19 C.F.R. § 351.218(d)(3)(ii)(F)-(G). For both domestic and respondent interested parties, Commerce will evaluate the adequacy of responses on a case-by-case basis, but has broadly defined what constitutes adequate responses to a notice of initiation. 19 C.F.R. §

351.218(e)(1)(i)-(ii). For respondent interested parties to meet the threshold, Commerce requires that they submit substantive responses, as defined above, and in addition, that they represent 50% of the volume of the total exports in question. 19 C.F.R. § 351.218(e)(1)(ii)(A).

Commerce's determination not to revoke the order on the basis of inadequate responses or the lack of response by a domestic producer, does not give rise to legal challenge where, as here, the domestic response was submitted in accordance with all applicable regulations. Commerce's rules for the treatment of domestic and respondent interested parties are unambiguous. Neither the statute nor the regulations prohibit Commerce from treating responses received by domestic interested parties differently than those received by respondent interested parties. Neither the statute nor the regulations compel Commerce to construe the term "inadequate" for purposes of evaluating the responses of domestic and respondent interested parties.

The purpose of the antidumping statute is to "protect domestic manufacturing against foreign manufacturers who sell at less than fair market value." Koyo Seiko Co., Ltd. v. United States, 20 F.3d 1156, 1159 (Fed Cir. 1994). The fact that Congress included a threshold requirement of domestic support before initiating an antidumping investigation is indicative that Congress did not perceive a need to impose a similar threshold to launch a review of an order resulting from such an investigation. See 19 U.S.C. § 1673a(c)(4). Indeed, of the methods in which to initiate sunset reviews mandated by the WTO General Agreement on Tariffs and Trade, the United States opted to automatically initiate sunset reviews, as opposed to initiating reviews only in response to a request by the domestic industry. See Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade, Article 11.3 (1994). In addition, the applicable regulations provide the framework for Commerce to determine the adequacy of

11

responses. 19 C.F.R. § 351.218(d)(3). Here, the domestic interested party filed a substantive response to the notice of initiation which contained the required information and Commerce, as a result, correctly decided to launch an investigation. Similarly, Plaintiffs NSK and JTEKT filed substantive responses as respondent "interested parties" that also met the Department's threshold as adequate responses. Accordingly, Commerce did not abuse its discretion by launching a sunset review based on the participation of only one domestic interested party.

**2**
**Commerce is Not Obligated to Adjust Margins Calculated in Prior Reviews**
**Retroactively to Reflect WTO Decisions**

NSK challenges the Department's methodology used to calculate dumping margins in the original investigation and argue that, had Commerce followed WTO decisions in its fair-value analysis, its margins would have been zero or <u>de minimis</u> in multiple reviews, and Commerce, as a result, would have revoked the order. NSK's Brief at 15-21. Specifically, NSK argues that the likelihood determination that is undertaken during a sunset review involves "imports entered after the effective date of the potential revocation of the order" and is therefore an inquiry into evidence similar to conducting a new investigation. <u>Id.</u> at 18 (quoting <u>AG der Dillinger Huttenwerke et al. v. United States</u>, 26 CIT 298, 317, 193 F. Supp. 2d 1339 (2002) ("<u>Dillinger</u>")). In addition, NSK asserts that Commerce is required to apply "current law" to any sunset review, irrespective of the date of issuance of the order.[3] <u>Id.</u>

NSK notes that in a March 6, 2006, announcement in the Federal Register, Commerce modifies its prior position on whether to offset less than fair value sales with fair value sales

---

[3] Plaintiffs concede that Commerce may apply "old" law in a sunset review provided that the agency can demonstrate that applying new law does not lead to the most accurate results. NSK's Brief at 18 (citing <u>Dillinger</u>, 26 CIT at 317-18).

("zeroing"[4]) and states its intention to apply the offset in future investigations where it applies an average-to-average methodology. Id. at 19; Antidumping Proceedings: Calculation of the Weighted Average Dumping Margin During an Antidumping Duty Investigation, 71 Fed. Reg. 11,189 (March 6, 2006) ("Antidumping Proceedings").[5]  NSK however, contends that even if Commerce selects a methodology other than the average-to-average methodology, "current legal developments confirm that the agency's practice of zeroing should be eliminated from whatever dumping calculation Commerce makes." NSK's Brief at 20.  In addition, NSK argues that Commerce, "if good cause is shown," may consider factors other than weighted average dumping margins determined in the original investigation and subsequent reviews, and that, based on the legislative history of the statute, Commerce has substantial discretion to adjust margins as it deems appropriate. Id. at 16-17 (citing 19 U.S.C. § 1675a(c)(1)(A); 19 U.S.C. § 1975a(c)(2)).

Defendant maintains that its determination not to revoke the order is in accordance with law because it was not obligated to adjust respondents' prior margins to reflect WTO decisions concerning the practice of "zeroing." Defendant's Response at 18.  Defendant reasons that those

---

[4] "Zeroing" is the practice of assigning the value of zero to negative margin transactions in the calculation of the weighted average margin. See, e.g., Corus Staal BV v. United States, 2007 LEXIS 22531 at *1-2 n.2 (Fed. Cir. 2007).

[5] In a request for comments on the issue, Commerce stated that:

> [T]he Department usually makes comparisons between average export prices and average normal values and does not offset any dumping that is found with the results of comparisons for which the average export price exceeds the average normal value. A recent WTO dispute settlement report has found that the United States application of this methodology was inconsistent with our WTO obligations. In response to this report, the Department will abandon the use of average-to-average comparisons without such offsets.

Antidumping Proceedings, 71 Fed. Reg. at 11,189.

decisions have not yet been implemented into U.S. law, and in any event, would operate prospectively only from such a date as the decisions are implemented. Id.

In a likelihood determination, Commerce is to decide, in accordance with the Statement of Administrative Action accompanying the Uruguay Rounds Agreements Act that revocation is likely to lead to continuation or recurrence of dumping in instances where "declining import volumes are accompanied by the continued existence of dumping margins after the issuance of an order." SAA at 889.  Here, Commerce based its decision on the fact that margins on ball bearings from Japan had been above de minimis during the original investigation and in fifteen subsequent reviews. Decision Memo at 5.  As a result, Commerce reasonably concluded that while "[d]eclining margins alone normally are not determinative as to whether revocation of an antidumping order is not likely to lead to continuation or recurrence of dumping . . . continuing margins at any level would lead to a finding of likelihood." Id. at 4.  In response to NSK's contention that Commerce refused to adjust the margins, and  "zero" negative margins, the Department correctly remarked that the WTO panel decisions cited by Plaintiffs "had no effect upon the margins calculated in previous administrative proceedings" and that "implementation of the WTO panel decisions is prospective and relates only to new investigations using average-to-average comparisons." Defendant's Response at 19-20.  Commerce's decision in this case is consistent with Federal Circuit precedent which has repeatedly upheld Commerce's margin-calculation methodology. Defendant's Response at 22; see also Corus Staal BV, 395 F.3d 1343, 1348-50 (Fed. Cir. 2005); Timken Co. v. United States, 354 F.3d 1334, 1344-45 (Fed. Cir. 2004).

This court has continuously affirmed Commerce's non-dumped sales methodology relating to margins calculated pre- or post-URAA dumping law. See, e.g., Paul Muller Industrie

GmbH & Co. v. United States, 435 F. Supp. 2d 1241 (CIT 2006); NSK Ltd. v. United States, 358

F. Supp. 2d 1276 (CIT 2005); SNR Roulements v. United States, 341 F. Supp. 2d 1334 (CIT

2004); PAM, S.p.A. v. United States, 265 F. Supp. 2d 1362 (CIT 2003); Timken v. United

States, 26 CIT 1072, 240 F. Supp. 2d 1228 (2002); Bowe Passat Reinigungs-Und

Waschereitechnik GmbH v. United States, 20 CIT 558, 926 F. Supp. 1138 (1996); Serampore

Industries Pvt., Ltd. v. United States, 11 CIT 866, 675 F. Supp. 1354 (1987).  Accordingly,

Commerce acted in conformity with prevailing law in determining that prior margins were

calculated using an appropriate methodology and properly used those margins, without

adjustments, in its sunset review to ascertain the likelihood of dumping.  A WTO decision does

not take precedent over U.S. law absent its adoption into law by the United States Congress. See

SAA at 1032 ("Reports issued by panels or the Appellate Body under the DSU have no binding

effect under the law of the United States and do not represent an expression  of U.S. foreign trade

policy."); see also 19 U.S.C. § 3533.  Commerce acted consistently with governing law when it

declined to adjust NSK's margins on the basis of the WTO decisions.

NSK's argument that the court should apply the practice of zeroing retroactively in

reliance on Commerce's March 6, 2006 Federal Register notice is also not supported by law.

Antidumping Proceedings, 71 Fed. Reg. at 11,189.  Commerce in its Federal Register notice

expressed its intent to "offset any dumping that is found with the results of comparisons for

which the average export price exceeds the average normal value" and "abandon the use of

average-to-average comparisons without such offsets." Id.  However, the implementation of the

WTO decision is prospective and relates only to new investigations using average-to-average

comparisons.  Commerce expressly stated in its March 6 notice that "[a]ny changes in

methodology will be applied in all investigations initiated on the basis of petitions received on or

after the first day of the month following the date of publication of the Department's final notice of the new weighted average dumping margin calculation methodology." Id. (emphasis added). Commerce published its Final Modification on December 27, 2006, modified on January 26, 2007, at which time Commerce specified that it would "apply the final modification in all current and future antidumping investigations as of the effective date." Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification, 71 Fed. Reg. 77,722 (December 27, 2006) ("Final Modification"); Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margins in Antidumping Investigations; Change in Effective Date of Final Modification, 72 Fed. Reg. 3783 (January 26, 2007) ("Amended Final Modification"). The effective date of the modification was set at February 22, 2007. Amended Final Modification. As a result, Commerce expressly stated that it would not be applying the modification retroactively.

The sunset investigation to which this matter relates was initiated in June 2005, not as a new investigation, but as a review. Notice of Initiation, 70 Fed. Reg. at 31,423. In addition, Commerce did not apply the average-to-average methodology to which the offset applies. Commerce thus acted in accordance with law when it determined that it was not required to adjust NSK's margins retroactively.

**3**
**Commerce Adequately Examined the Volume of Imports Before and After the Issuance of the Order and Determined that Import Volumes Decreased Since the Issuance of the Order**

Plaintiffs JTEKT challenge Commerce's finding that the total weight and value of Japanese ball bearings imported "decreased substantially" post-order and remained "well-below pre-order levels." JTEKT's Brief at 3-4, 6 (citing Preliminary Decision Memo at 10).

Instead, JTEKT contends that the value of imports did not decrease post-order and that the average value of imports immediately preceding the second sunset review was over $296 million, more than 25% higher than the average value of imports in the two years prior to the imposition of the order in 1989. Id. at 6, 10 (citing Preliminary Decision Memo, U.S. Imports Statistics).  JTEKT also argues that the mere 10% difference between the average weight in the two years preceding the imposition of the order, as compared with the average weight imported over the period of review does not support the Department's conclusion that dumping is likely to continue or recur if the order were revoked. Id. at 10-11.  JTEKT asserts that a simple comparison of pre- and post-order figures does not adequately inform Commerce's likelihood determination, but that the numbers must be considered concurrently with market trends. Id. at 7, 12.  As a result, JTEKT argues that the Department acted contrary to its statutory mandate which directs it to consider "the volume of imports of the subject merchandise for the period before and the period after the issuance of the antidumping duty order." Id. at 9 (citing 19 U.S.C. § 1675a(c)(1)(B)).  According to JTEKT, the available data indicates that the total weight and value of imports from Japan remained stable during the past 15 years and did not decrease significantly and that the Department's conclusion therefore is not supported by substantial evidence and not in accordance with law. Id. at 4.

NSK argues that the agency failed: (1) to consider the pre- and post-order volume of subject imports; (2) to collect data about subject import volumes; and (3) to analyze import-volume databases. NSK's Brief at 6.  Specifically NSK contends that Commerce failed to collect data relating to the volume of subject imports, but relied on non-volume data to conclude in its Preliminary Results that imports by weight and value had remained below pre-order volumes for the duration of the order. NSK's Brief at 5, 21-23.  NSK submits that import data furnished by

17

Timken in its substantive response demonstrated that imports of ball bearings from Japan had comparatively increased by value during the period 2000-2004 relative to the 1987-1990 period of review. Id. at 5 (citing Timken's Substantive Response, Pub. Doc. 12, at 10 (July 1, 2005)). NSK argues that an accurate analysis of the import value in conjunction with the export weight data suggests that import volume has remained stable pre- and post order. Id. at 24-25.

In the alternative, NSK argues that the data supports revocation of the antidumping order. NSK's Brief at 23-26. NSK provides a table in its brief, upon which it concludes that "the value of subject imports is more than 25 percent higher for the past five years than the average value of subject imports for the years preceding the order." Id. at 24 (citing PRM, Pub. Doc. 46, Attachment). NSK contends that a corresponding decline in domestic consumption implies that additional imports, upon revocation of the order, are unlikely to yield increased market share. Id. NSK, furthermore, argues that the weight of post-order imports levels, on average, is not significantly below pre-order levels and that, therefore, revocation of the order would not likely lead to continuation or recurrence of dumping. Id. at 25.

Defendant argues that its finding that revocation of the order would likely lead to the continuation or recurrence of dumping was in accordance with law and supported by substantial evidence because dumping continued above de minimis levels after the issuance of the order and throughout the period of review, and because import volumes declined over the life of the order. Defendant's Response at 18. Defendant also contends that its analysis of import volume comports with the statute because Commerce's interpretation of the statute to permit analysis of weighted import volumes was a reasonable exercise of its discretion. Defendant further argues that it is not obligated to analyze volume in terms of average weight. Id. at 28-29.

Commerce is required to consider "the volume of imports of the subject merchandise for the period before and the period after the issuance of the antidumping duty order." 19 U.S.C. § 1675a(c)(1)(B). The SAA provides that "[d]eclining import volumes accompanied by the continued existence of dumping margins after the issuance of the order may provide a strong indication that, absent an order, dumping would be likely to continue, because the evidence would indicate the exporter needs to dump to sell at pre-order volumes." SAA at 889. Here, Commerce reviewed the Japanese export statistics provided by the parties to the investigation, which indicated that the volume of imports at no point, from the imposition of the order until 2004, exceeded the import volumes in 1988 and 1989, prior to the discipline of the order. See, e.g., Decision Memo, Attachment 4, Japanese Ministry of Finance ("MOF") Trade Statistics. As a result, Commerce reasonably concluded that the volume of Japanese imports continued to decrease from the imposition of the order throughout the period of review and for the life of the order.

Plaintiffs JTEKT and NSK fail to set forth valid support for the proposition that Commerce is required to provide its analyses using average, as opposed to per annum, figures in its assessment of the volume of imports. See JTEKT's Brief at 10-11; NSK's Brief at 25. NSK's contention that because the decrease in average post-order import levels is not "significantly below" pre-order levels, Commerce's likelihood determination is flawed, is likewise unsupported as they do not provide that there is a threshold Commerce must meet to take into account a decrease in import volumes. See NSK's Brief at 25. Notwithstanding these assertions, the statute and the SAA do not speak to the use of averages, and the SAA specifically notes that declining import volumes coupled with dumping may be a strong indicator that dumping would likely continue. See SAA at 889. In fact, the SAA states that a finding of no dumping margins

19

accompanied by steady imports, or increasing imports, may indicate that foreign importers do not need to dump in order to maintain market share in the United States. Id. at 889-90. Here, Commerce determined that dumping continued above de minimis levels and identified a steady decrease in import volumes and therefore reasonably concluded that dumping was likely to recur. Preliminary Decision Memo at 10; see also Final Results at 4. In addition, Commerce expressly stated in its Final Results that it considered market share in its analysis. Decision Memo at 9.

**4**
**Commerce Acted within its Discretion in Determining that it Did Not Require Additional Fact-Gathering in Order to Adequately Make a Determination Based on the Information Provided by the Parties**

Plaintiffs NSK argue that Commerce failed to fulfill its statutory obligation to conduct a full sunset review by not engaging in additional fact-gathering and basing its decision purely on the information submitted by the parties. NSK's Brief at 11-13. NSK says that Commerce's inactivity is contrary to statute. Id. at 12. In support of this contention, NSK cites Dillinger for the proposition that the statute "does not charge any interested party with the ultimate burden of persuasion" and that "rather than place a burden of proof on either the foreign or the domestic interested party, the statute provides that parties may submit information in their response to Commerce's notice of initiation of review." 26 CIT at 303-04. NSK suggests that it was incumbent upon Commerce to issue questionnaires based on the respondents' substantive filings and to analyze the parties' arguments. NSK's Brief at 12-13. Indeed NSK claims that under Dillinger, the agency in a full review is required to "engage in an analysis that is at least somewhat more searching" than in an expedited review, and that "pursuant to its 'fact-gathering'

obligation in a full sunset review, Commerce may solicit more information as necessary." <u>Id</u>; NSK's Brief at 11-12 (citing <u>Dillinger</u>, 26 CIT at 305).

Commerce argues that it did not act contrary to its statutory mandate when it based its determination on information submitted by the parties in the record because, although it may obtain additional information in full sunset reviews, it is not required to do so. Defendant's Response at 30.

The statute and subsequent interpretations are silent on the issue of whether Commerce is required to actively solicit information from the parties in a full sunset review.  The question for the court is whether it was reasonable for Commerce to rely solely on the information submitted by the parties in making its determination.  Based on Commerce's statutory mandate to compare pre-order volumes to post-order volumes, Commerce reasonably relied on the export statistics provided by Plaintiffs concerning the volume and value of ball bearings from Japan prior to the imposition of the order in 1989 and throughout the period of review. <u>See</u> Decision Memo, Attachment 4, Japanese MOF Trade Statistics.  NSK argues that the regulations do not imply that the responses provided by the parties will "form the entire basis on which the agency will decide that review." NSK's Reply at 2.  However, the regulations also do not direct the type of investigation that Commerce is required to perform, but instead defer to the discretion of the agency to ensure that the appropriate information is obtained. <u>See</u> 19 C.F.R. § 351.218(d)(3)(ii)-(iv).  NSK contends that the statutory mandate that permits Commerce to conduct an expedited review "without further investigation" in the absence of a response to the notice of initiation (or inadequate responses) "presupposes that full reviews will involve further investigation." NSK's Reply at 2.  This logic is unsupported by the statute.

The statute does not expressly direct that a full investigation shall involve fielding information beyond the parties' substantive responses to the notice of initiation.  In addition, the SAA provides a distinction between a "full-fledged review" involving fact gathering, and an "expedited review" based on facts available.  The SAA explains the distinction as follows:

> If parties provide no or inadequate information in response to a notice of initiation, it is reasonable to conclude that they would not provide adequate information if the agencies conducted a full-fledged review. However, when there is sufficient willingness to participate and adequate indication that parties will submit information requested throughout the proceeding, the agencies will conduct a full review.

SAA at 879-80; see also Dillinger, 26 CIT at 305.

The parties also argue the merits of Dillinger, in which this court held that Commerce violated its legal obligation to conduct a full review "because it failed to consider adequately evidence on the record, or to seek additional evidence necessary to make its determination." Dillinger, 26 CIT at 305; see NSK's Brief at 12; NSK's Reply at 3; Defendant's Response at 30. In this case Commerce did consider the evidence on the record and acted within its discretion in determining the adequacy of the data in informing its final determination.  The court in Dillinger held that the parties "may submit information in their response to Commerce's notice of initiation of review," but did not hold that the parties were required to submit such information or that Commerce is foreclosed from relying on such information, once submitted. Id; 26 CIT at 304.  Indeed, NSK were also not barred from submitting additional information to Commerce during the investigation, had Plaintiffs deemed it necessary.

The agency's role is to weigh the evidence.  Plaintiffs correctly assert that Commerce may issue questionnaires and solicit additional information from the respondents during a full investigation.  Plaintiffs, however, do not demonstrate that Commerce is legally required to do so.  Here, this court must determine whether Commerce's interpretation of the statute, that it was

not required to seek additional information to make its determination, was reasonable. There

was no express Congressional intent that Commerce engage in a fact-finding process that goes

beyond the parties' substantive responses. See Chevron, 467 U.S. at 842-43. Furthermore, in

accordance with the regulations promulgated for fact-gathering in sunset reviews, the SAA and

prevailing case law, Commerce is not required to issue questionnaires when conducting a full

investigation. See, e.g., Antidumping Duties; Countervailing Duties; Final Rule, 62 Fed. Reg.

27,296, 27,324 (May 19, 1997).[6] Accordingly Commerce acted well within the bounds of its

discretion when it determined that it did not require additional fact-gathering in order to

adequately make a determination based on the information provided by the parties.


**B**


**Commerce Did Not Err in Choosing to Report a More Recently Calculated Dumping
Margin to the ITC as the Magnitude of the Margin Likely to Prevail**


Timken contends that Commerce should have reported the margins from the original

investigation to the ITC and that the Department's decision to report more recently calculated

dumping margins for the Japanese respondents was contrary to law. The Timken Company's

Rule 56.2 Motion for Judgment Upon the Agency Record and Memorandum of Points and

Authorities ("Timken's Brief") at 2. Timken argues that the more recently calculated margins do

not comport with the Department's mandate to consider pre- and post-order import volumes in

determining foreign companies' likely behavior absent the discipline of an order. Id. at 24-25.

---

[6] "[I]t may not be necessary to issue questionnaires in every sunset review. Accordingly, we
have revised § 351.221(c)(5) by adding a new paragraph (iii) which permits the Secretary to
refrain from issuing the questionnaires called for by § 351.221(b)(2). Of course, the Secretary
would retain the discretion to issue questionnaires in sunset reviews in appropriate situations." 62
Fed. Reg. at 27,324.

While Timken recognizes the Department's practice of using more recently calculated margins for pre-order volumes, it contends that Commerce has adopted this approach primarily in cases where it also made market share comparisons. Id. at 25-26. Timken submits that Commerce ignored available evidence pertaining to pre-order imports and market share in favor of using the margins calculated more recently during the period of review. Id. at 3, 26 (citing Tapered Roller Bearings from the People's Republic of China; Final Results of Full Sunset Review, 65 Fed. Reg. 11,550 (March 3, 2000) ("Tapered Roller Bearings").

Timken also contends that Commerce previously has held that any margin calculated under the discipline of an order cannot be used to compare pre- and post order volumes because that margin "cannot logically reflect import volumes or pricing practices likely to exist if the order were revoked." Id. at 26 (citing Pure Magnesium from Canada; Final Results of Full Sunset Review, 65 Fed. Reg. 41,436 (July 5, 2005) ("Magnesium")). Timken contends that the Japanese respondents' exports were significantly below pre-order volumes and that Commerce "failed to follow the SAA's instructions of looking at the 'relationship between dumping margins, or the absence of margins, and the volume of imports of the subject merchandise, comparing the periods before and after the issuance of an order.'" Timken's Brief at 28 (citing SAA at 889-890).

Timken furthermore asserts that Commerce's characterization that respondents' dumping margins were declining, were not supported by substantial evidence. Id. at 37. Timken argues that the figures do not support Commerce's conclusion, but instead that the margins fluctuated and that there was no pattern of decline. Id.

Defendant argues that Commerce's reporting of the magnitude of the margin likely to prevail from later reviews was supported by substantial evidence and was in accordance with

law. Defendant's Response at 34. Commerce asserts that it properly analyzed import volumes and that Timken "conflate the criteria for determining likelihood with the separate determination of the margin likely to prevail." Id. at 36. Commerce also contends that there is no requirement that it analyze import volumes in the same manner for purposes of its magnitude determination and that its analysis of the respondents' relative market share, based on percentage exports, was supported by substantial evidence. Id. at 39, 41. Commerce contends that it is not precluded, by either the statute or the SAA, from analyzing market share in terms of relative share of exports, and that Timken's reliance on Tapered Roller Bearings is misplaced because Commerce in that case relied on "[c]ompany-specific export values as reported by domestic and respondent interested parties rather than relative United States market share." Id. at 42-43. As a result, Commerce argues that its decision to report margins from an earlier review, as opposed to the margin calculated in the original investigation, was supported by substantial evidence and in accordance with law. Id.

JTEKT and NSK oppose Timken's claim that the margins in the original investigation would be a better gauge of the margins likely to prevail if the order was revoked. Memorandum of JTEKT Corp. and Koyo Corp. of U.S.A. in Response to Timken U.S. Corp.'s Motion for Judgment on the Agency Record ("JTEKT's Response") at 2-4; Memorandum in Opposition to the Timken Company's Rule 56.2 Motion for Judgment Upon the Agency Record ("NSK's Response") at 11. JTEKT argues that the margins calculated in the 2003-2004 administrative review are a better measure of the margins likely to prevail if the antidumping order were revoked as opposed to the margins originally calculated for its predecessor, Koyo, fifteen years ago. JTEKT's Response at 4. JTEKT contend that Timken obfuscates the legal and factual elements the Department must consider in making its determination and that Commerce, in fact,

has broad discretion to determine the margins likely to prevail if the order was revoked. Id.  In

response to Timken's argument that the Department did not apply the correct standard, JTEKT

notes that:

> . . . the statutory and SAA provisions cited by Timken in support of its argument pertain
> not to the evidence to be considered by the Department in determining the margin likely
> to prevail, but rather the distinct, and more fundamental, determination of whether
> dumping is likely to continue or recur if the order were revoked.

Id. at 7.  JTEKT notes that if the Department has identified that dumping margins have decreased

over the life of the order and imports have remained steady over the same time period, then it is

appropriate for the Department to use more recently calculated margins. Id. at 9-10.

Timken correctly states that the conventional use of pre-order volume figures is

appropriate because it is "the only calculated rate that reflects the behavior of exporters . . .

without the discipline of an order . . . ." Timken's Brief at 25 (citing SAA at 890).  However,

though the governing statute directs that Commerce must provide to the ITC the margin that is

likely to prevail if the order was revoked, 19 U.S.C § 1675a(c)(3), the SAA states that this rate

will "normally" be the rate calculated in the original investigation. SAA at 890.  The inclusion of

the term "normally" implies that circumstances may arise where the margins calculated in the

original investigation may not be the most appropriate margins to report to the ITC.  In fact, the

SAA provides that "[i]n certain instances, a more recently calculated rate may be appropriate.

For example, if dumping margins have declined over the life of an order and imports have

remained steady or increased, Commerce may conclude that exporters are likely to continue

dumping at the lower rates found in a more recent review." Id. at 890-891 (emphasis added).

Timken's reliance on Magnesium for the proposition that pre-order volumes must be used

in lieu of more recent margins is misplaced.  Magnesium is distinguishable because the

respondent in that case argued that because it was a new producer the pre-order import volumes Commerce identified did not reflect normal commercial behavior, and that a later year would better reflect pre-order imports. 65 Fed. Reg. at 41,437.  Commerce concluded that the later year did not adequately reflect pre-order volumes because the order was already in effect at that time. Id.  Thus, the finding in Magnesium does not invalidate Commerce's decision in this case to report more recent dumping margins to the ITC based on its finding that dumping margins declined over the life of the order and that imports remained stable, as contemplated by the SAA. See SAA at 890-891.

Contrary to Timken's contentions, Commerce explicitly stated in its Final Determination that it had analyzed all Japanese respondents' submissions reporting relative market share, which indicated that imports had remained steady or increased for the life of the order. Decision Memorandum at 9-10.  In fact, based on the information that the interested parties submitted, the Department concluded that import volumes were increasing as measured by market share. See Defendant's Response at 36.  Timken's contention that Commerce ignored the evidence submitted is not substantiated by the evidence in the record.

There is no requirement that Commerce analyze margins in the same manner that it analyzes import volumes for purposes of its magnitude determination.  Commerce based its conclusion that the respondents' margins decreased since the issuance of the order on its examination of the past five reviews, and for the life of the order. Decision Memo at 2, 9-10. Commerce concluded that these margins were lower than those calculated in the original investigation and that when compared, the dumping margins decreased for the life of the order. Id. at 9.  In fact, Commerce concluded that NSK's dumping margin ranged from de minimis levels to 18.88%, while its margin in the original investigation was 42.99%, and that Koyo's

(JTEKT) margins over the past 15 reviews were between 4.98% and 18.6% compared with a pre-order margin of 73.55%. Id. at 9. Commerce concluded that each respondent's market share "remained steady or increased during the sunset review period." Id. at 9. Timken's argument focuses on year-to-year variations and does not take into account that each respondent's margin declined overall. Accordingly, Commerce's analysis is sustained.

**1**
### Commerce is not Required to Address All Arguments Advanced by the Respondents in a Sunset Review

Timken asserts that Commerce has a statutory obligation pursuant to § 1677f(i)(3) to address all arguments raised by respondents and that by not addressing its weight-based statistics argument, Commerce contravened the statute. Timken's Brief at 38. With respect to the weight-based statistics, Timken argues that Japanese imports by weight declined during the period of review. Id. at 39-40. Timken asserts that it had argued in favor of using weight-based statistics and cautioned the use of aggregate U.S. import statistics contending that such numbers may be distorted due to their organization by HTS [Harmonized Tariff Schedules] categories. Id. at 39.

The Defendant denies that it is required to address all arguments advanced by parties to a sunset review, but says that pursuant to prevailing law it shall address issues material to making its determination. Defendant's Response at 38.

Pursuant to statute Commerce is required to provide an explanation of the basis of its decision and address the relevant arguments made by interested parties. 19 U.S.C. § 1677f(i)(3). However, "[e]xisting law does not require that an agency make an explicit response made by every party, but instead requires that issues material to the agency's determination be discussed so that the path of the agency may reasonably be discerned by the reviewing court." SAA at 892

(internal citations omitted). Here, Commerce examined the import and export statistics provided by the respondents and used weight-based data where available. See, e.g., Defendant's Response at 39 (citing Preliminary Results at cmt. 1). Commerce used the most company-specific data available  because the respondents provided information regarding their import volumes on a per-unit basis. Id.  As a result Commerce did not act contrary to law when it did not address all of Timken's arguments in its Final Results.

# V

## CONCLUSION

For the foregoing reasons, Commerce's determination in Ball Bearings and Parts Thereof from Japan and Singapore; Five-Year Sunset Reviews of Antidumping Duty Orders; Final Results, 71 Fed. Reg. 26,321 (May 4, 2006), as amended by, 71 Fed. Reg. 30,378 (May 26, 2006) is AFFIRMED; and Plaintiffs' NSK, JTEKT and Timken's Motions for Judgment Upon the Agency Record are DENIED.

___/s/ Evan J. Wallach___
Evan J. Wallach, Judge

Dated: November 30, 2007
        New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                   :
NMB SINGAPORE LTD., et al.,        :
                                   :
            Plaintiffs,            :
                                   :      Before:           WALLACH, Judge
        v.                         :      Consol. Court No.: 06-00182
                                   :
UNITED STATES,                     :
                                   :
            Defendant,             :
                                   :
        and                        :
                                   :
THE TIMKEN COMPANY,                :
                                   :
            Defendant-Intervenor.  :
_____:
```

<u>ORDER AND JUDGMENT</u>

This case having come before the court upon the Motion of Plaintiffs JTEKT Corporation and Koyo Corporation of U.S.A. for Judgment on the Agency Record; Motion for Judgment on the Agency Record submitted by Plaintiffs NSK Corporation and NSK Ltd.; and The Timken Company's Rule 56.2 Motion for Judgment Upon the Agency Record (collectively "Plaintiffs' Motions"); the court having reviewed all papers and pleadings on file herein, having heard oral argument by each party, and after due deliberation, having reached a decision herein; it is hereby

ORDERED ADJUDGED AND DECREED that Plaintiffs' Motions are DENIED; and it is further

ORDERED ADJUDGED AND DECREED that the decision of the U.S. Department of Commerce ("Commerce") in <u>Ball Bearings and Parts Thereof from Japan and Singapore; Five-Year Sunset Reviews of Antidumping Duty Orders; Final Results,</u> 71 Fed. Reg. 26,321 (May 4, 2006), as amended by <u>Ball Bearings and Parts Thereof from Japan; Five-year Sunset Review of Antidumping Duty Order; Amended Final Results,</u> 71 Fed. Reg. 30,378 (May 26, 2006), is hereby AFFIRMED; and it is further

ORDERED that all parties shall review the court's Opinion in this matter and notify the court in writing on or before Friday, December 7, 2007, whether any information contained in the Opinion is confidential, identify any such information, and request its deletion from the public version of the Opinion to be issued thereafter. The parties shall suggest alternative language for any portions they wish deleted. If a party determines that no information needs to be deleted, that

party shall so notify the court in writing on or before December 7, 2007.


                                    ____/s/ Evan J. Wallach_____
                                        Evan J. Wallach, Judge

Dated: November 30, 2007
         New York, New York

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                                                          Deputy Clerk